## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

FRANK R.,

        Plaintiff,

    v.

KILOLO KIJAKAZI,
 ACTING COMMISSIONER OF SOCIAL
 SECURITY,[1]

        Defendant.

No. 19 CV 3223

Magistrate Judge McShain

### MEMORANDUM OPINION AND ORDER

Plaintiff Frank R. brings this action under 42 U.S.C. § 405(g) for judicial review of the Social Security Administration's (SSA) decision denying his application for benefits. For the following reasons, the Court denies plaintiff's motion for summary judgment [17],[2] grants the Acting Commissioner of Social Security's (Commissioner) motion for summary judgment [25], and affirms the Commissioner's decision denying plaintiff's application for benefits.

### Procedural Background

In August 2016, plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging an onset date of June 29, 2016. [14-1] 379.

---

[1] In accordance with Fed. R. Civ. P. 25(d), Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as the defendant in this case in place of the former Commissioner of Social Security, Andrew Saul.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, with the exception of citations to the administrative record [14-1], which refer to the page numbers in the bottom right corner of each page.

Plaintiff's claim was denied initially and on reconsideration. [*Id.*] 428-48. Plaintiff requested a hearing, which was held by an administrative law judge (ALJ) on March 23, 2018. [*Id.*] 379. In a decision dated June 28, 2018, the ALJ found that plaintiff was not disabled. [*Id.*] 379-89. The Appeals Council denied review on March 24, 2019 [*id.*] 1-6, making the ALJ's decision the agency's final decision. *See* 20 C.F.R. §§ 404.955, 404.981.  Plaintiff timely appealed to this Court [1], and the Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).[3]

### Factual Background

Plaintiff, who is now fifty-five years old, *see* [14-1] 13, sought disability benefits based on his back problems, an impairment of his left knee, and obesity. Before applying for benefits, plaintiff worked for the same company for almost thirty years, first as a tank washer and then as a manager of a tank-washing facility. [*Id.*] 403-04.

### I.    Plaintiff's Back Problems

The medical record establishes that plaintiff has a history of low back pain that began in 1998, when he fell off of a trailer at work, and has progressively worsened. [14-1] 685, 732; *see also* [*id.*] 660. Plaintiff has described the pain as centered in his lower back, more severe on his left side, and worse with activity. [*Id.*] 685. The pain radiates from his back down both of his legs, and plaintiff has experienced numbness, tingling, and cramping. [*Id.*] 664, 685.

Plaintiff has been diagnosed with lumbar radiculopathy. [14-1] 629. An MRI of plaintiff's spine taken in April 2017 revealed grade II anteriolisthesis at the L5-S1

---

[3] The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. [10]

level of the lumbar spine, significant multilevel spondylosis that is worse at the L4-L5 and L5-S1 levels, severe bilateral foraminal stenosis at the L5-S1 level, and bilateral foraminal stenosis and central canal stenosis at the L3-L4 and L4-L5 levels. [14-1] 734.

### A. Lumbar Steroid Injections and Pain Medication

Plaintiff has managed his back pain with lumbar steroid injections and pain medication while avoiding, and occasionally voicing strong opposition to having, lumbar surgery.

The administrative record reflects that plaintiff began receiving lumbar injections in late 2015 and continued receiving them through early 2018. According to a January 2016 treatment note prepared by plaintiff's pain doctor, Omar Said, plaintiff had undergone a transforaminal epidural steroid injection in December 2015. [14-1] 653. Plaintiff told Dr. Said that "he has had good benefit with that procedure," and he reported that his pain had "decreased to roughly a 3/10." [Id.]. In his notes assessing plaintiff's condition, Dr. Said recorded plaintiff's statement that "he is vehemently oppose [sic] to lumbar spine surgery." [Id.].

A treatment note prepared by Dr. Said after plaintiff's February 2016 appointment stated that his December 2015 injection "continues to be beneficial for him and he rates his pain today as a 2 or 3/10." [14-1] 651.

Plaintiff had another lumbar injection in mid-June 2016, and he reported to Dr. Said at a July 25, 2016 follow-up that he experienced "approximately 50% durable relief" from the injection but "his pain is returning at this time." [14-1] 646. Plaintiff's

pain was worse with activity, but he managed it by resting and taking medication. [*Id.*]. Dr. Said's assessment was that the injections provided "good relief" but the relief was "not long lasting." [*Id.*].

Plaintiff received another lumbar epidural steroid injection on January 28, 2017. [14-1] 749. At a visit with Dr. Said the next month, plaintiff "endorse[d] only 25% relief for a few days, but now his pain has returned to baseline," which plaintiff estimated as a 9/10. [*Id.*] 767. Plaintiff was taking two or three tablets of Norco to manage his pain around this time, and he reported that it was difficult to walk and perform his activities of daily living. [*Id.*]. Dr. Said discussed the possibility of surgery, but plaintiff was "strongly opposed to consideration of lumbar spine surgery." [*Id.*].

Plaintiff's next injection was administered on May 6, 2017. [14-1] 748. At a follow-up appointment with Dr. Said three weeks later, plaintiff reported that the injection provided "25% improvement in pain and functionality" and that his pain was down to a 6/10. [*Id.*] 761. At the same time, plaintiff described his pain as "severe" and "limiting his functionality." [*Id.*]. Plaintiff also reported that he was taking Percocet, which was "more effective for him than the Norco was for his pain." [*Id.*]. In his assessment of plaintiff's condition, Dr. Said opined that the injections "do help considerably . . . but are temporary." [*Id.*]. Said discussed surgery with plaintiff, but plaintiff was "hesitant as he is nervous to have large spine surgery and the recovery process that comes with it." [*Id.*].

4

Dr. Said saw plaintiff again on June 19, 2017 and reported that plaintiff had experienced "excellent durable relief" from his May 2017 injection, that plaintiff's pain was at a 6.5/10, and that plaintiff's medications "do provide substantial benefit." [14-1] 759. Said also noted that plaintiff was then consulting with three surgeons about spinal surgery, but plaintiff wanted "to defer as long as possible." [*Id.*].

At a July 18, 2017 follow-up, plaintiff reported to Dr. Said that his pain "is returning," "averages a 6.5-7/10 in severity," and "does affect his ability to perform his ADLs and participate in recreational activities." [14-1] 757. Dr. Said noted that plaintiff's medications–Topamax, Percocet, and tizanidine–"provide significant benefit." [*Id.*].

Plaintiff's third lumbar injection of 2017 was administered on August 25. [14-1] 747. At a follow-up evaluation with Dr. Said on September 21, plaintiff "endorse[d] 50% relief, but only for 1 week following the procedure" and that he "continues to have possibly 10% relief," with his pain averaging a 6-7/10. [*Id.*] 755. Plaintiff said that the injection "'took the edge off' his low back pain," but his pain still "affect[ed] his ability to perform his activities of daily living and participate in recreational activities." [*Id.*]. Plaintiff told Dr. Said that he had been recommended for lumbar spine surgery, but that he "does not want to undergo any surgery at this time" because "he is a full-time caretaker for his mother-in-law at this point." [*Id.*]. Said opined that plaintiff's medications "provide significant analgesic effect without adverse side effects." [*Id.*] 756.

5

When plaintiff saw Dr. Said again in October 2017, he reported that his pain was a "6 or 7/10." [*Id.*] 753. Plaintiff stated that his pain had "improved with the previous lumbar epidural injections, which provided significant improvement in pain and his activity level." [*Id.*]. Plaintiff also said that "[h]e finds the medications"– Percocet and tizanidine–"are beneficial for him." [*Id.*]. At this time, plaintiff was also "attempting to have surgery done . . . though he has had difficulty getting clearance for surgery" due to his smoking habit and obesity. [*Id.*].

Dr. Said administered another epidural injection in November 2017. [14-1] 778. At a follow-up appointment the next month, plaintiff "endorse[d] about 50% durable pain relief" and reported that "he has been very pleased with the results of the injection and notes a substantial increase in his functionality as a result." [*Id.*]. 783. Although plaintiff rated his pain as a 7/10 and had experienced "some gradual return of his pain recently," plaintiff felt that "his pain is still significantly improved as when compared to prior to his most recent injection." [*Id.*]. Plaintiff's provider assessed that the injections "are very beneficial" for plaintiff and that the goal was "to maintain his functionality so he can continue to lose weight to improve his candidacy for lumbar spine surgery." [*Id.*]. When plaintiff saw Dr. Said in January 2018, plaintiff "continue[d] to endorse some benefit" from his November 2017 injection and reported that his pain remained at a 7/10. [*Id.*] 780. Plaintiff also said that he "does not want to undergo surgery and is still considering his options." [*Id.*].

Plaintiff received a further interlaminar epidural steroid injection on February 13, 2018. [14-1] 825. The treatment note reflects that plaintiff "has been having

intermittent epidural steroid injections, which [plaintiff] thinks helped his pain and function." [*Id.*]. At a follow-up appointment on March 15, 2018–eight days before his hearing with the ALJ–plaintiff reported that the most recent injection provided "25% durable relief." [*Id.*] 840. Plaintiff also stated that, while the injections have "helped his pain and function," the "past few injections have not provided relief as substantial as what he has experienced in the past" and his pain was averaging an 8/10. [*Id.*]. The March 2018 treatment notes also reflects that plaintiff was taking pain medications that were "beneficial without adverse effects." [*Id.*].

### B. Evaluations For Potential Spinal Surgery

In April 2017, plaintiff was evaluated by Dr. Lauren Burke, an orthopedic surgeon, "primarily for his back condition." [18] 6; *see* [14-1] 731-37. Dr. Burke noted that plaintiff "has been treating his symptoms conservatively . . . with narcotic pain medications, muscle relaxers, Voltaren gel, and epidural steroid injections." [14-1] 733. Dr. Burke explained to plaintiff that he "could potentially benefit from a surgical intervention" in the form of a "complete fusion of his lower spine," but she advised that plaintiff would not be a surgical candidate until he had lost weight. [*Id.*] 734. She also recommended that plaintiff "continue conservative care with injections since he is still getting multiple months of relief with this" and the injections "will help him get things in order for him to undergo surgery for weight loss and to have appropriate discussions about whether or not he wants to proceed with a knee surgery." [*Id.*].

In March 2018, plaintiff was evaluated by orthopedic surgeon Lauren Matteini. [14-1] 878-87. Dr. Matteini noted that plaintiff takes "chronic narcotics for his pain"

and "is undergoing injections, although the last one he had helped only minimally." [*Id.*] 879. Based on her evaluation of plaintiff, Dr. Matteini opined that plaintiff was not a candidate for surgery due to his obesity and that, in any event, it was advisable for plaintiff to have knee surgery before spinal surgery. [*Id.*] 880.

## II. Plaintiff's Knee Impairment

In 2009, plaintiff tore his left anterior cruciate ligament (ACL). [14-1] 685. Plaintiff had surgery to repair the tear, but he tore his ACL again within a year. [*Id.*].

At a November 2016 consultative examination with Dr. ChukwuEmika Ezike, plaintiff reported that he experienced "left knee pain with difficulty walking occasionally," that his "left knee gives out resulting in falls," and that "his last fall was about one week ago." [*Id.*]. Dr. Ezike observed that plaintiff did not use a cane "for support or confidence when ambulating." [*Id.*].

At his evaluation with Dr. Burke in April 2017, Dr. Burke observed that plaintiff's left knee "was in varus and on his x-ray, there is evidence of a leg length discrepancy with his right leg being longer than his left." [14-1] 734. Dr. Burke recommended that plaintiff "be evaluated for a knee replacement" and that knee surgery should precede any surgery on plaintiff's spine. [*Id.*].

At his March 2018 evaluation with Dr. Matteini for his back, Matteini observed that plaintiff was "able to ambulate with a fairly normal gait, although there is deformity about the left knee that is varus and pelvic obliquity associated with this." [14-1] 879. Dr. Matteini also observed that plaintiff "has yet to have evaluation of his left knee[.]" [*Id.*].

### III. ALJ's Decision

The ALJ issued an unfavorable decision denying plaintiff's claim for benefits. [14-1] 379-89. In her written decision, the ALJ relied on the standard, five-step analysis for deciding such claims.

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged onset date of June 29, 2016. [14-1] 381. At step two, the ALJ determined that plaintiff had the severe impairments of degenerative disc disease of the lumbar spine and obesity, but rejected plaintiff's claim that his ACL repair of the left knee constituted a severe impairment. [*Id.*] 382. In support, the ALJ stated that plaintiff "has not been receiving any specific treatment for his knee until just prior to the hearing, and there is no evidence that [*sic*] of an affected gait or abilities, as he testified at the hearing." [*Id.*]. At step three, the ALJ ruled that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App'x 1. [*Id.*] 383. Regarding Listing 1.04, which governs disorders of the spine, the ALJ observed that (1) "the record is devoid of evidence of nerve root compression, spinal arachnoiditis, or lumbar stenosis with an accompanying ineffective ambulation" and (2) Dr. Matteini had found that plaintiff "ambulated with a fairly normal gait." [*Id.*].

The ALJ then found that plaintiff had the residual functional capacity (RFC) to perform light work except that he could never climb ladders, ropes, or scaffolds and only occasionally balance, stoop, kneel, crouch, and crawl. [14-1] 383. Based on this RFC, the ALJ concluded at step four that plaintiff was unable to perform his past

relevant work as an operations manager or container washer. [*Id.*]. At step five, the ALJ found that there were unskilled jobs within the light exertional range that existed in significant numbers in the national economy that plaintiff could perform, including bench assembler, assembler II, and press operator. [*Id.*] 388. The ALJ accordingly found that plaintiff was not disabled. [*Id.*] 388-89.

### Legal Standard

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairment; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). But the standard "is not entirely uncritical. Where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brett D. v. Saul*, No. 19 C 8352, 2021 WL 2660753, at *1 (N.D. Ill. June 29, 2021) (internal quotation marks and citation omitted).

## Discussion

Plaintiff seeks reversal of the Commissioner's decision on two grounds. He first argues that substantial evidence does not support the ALJ's RFC determination because the ALJ erroneously concluded that his knee impairment was not a severe impairment and, consequently, the ALJ did not address the work limitations stemming from that impairment. [18] 5-10. Plaintiff then argues that the ALJ made a number of factual and legal errors when she rejected his "subjective symptom allegations" about his back problems. [*Id.*] 10-15.

## I. Substantial Evidence Supports The ALJ's RFC Determination.

"A disability claimant's RFC describes the maximum she can do in a work setting despite her mental and physical limitations." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014). "An ALJ must evaluate all relevant evidence when determining an applicant's RFC[.]" *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). "Although

11

an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence." *Id.* at 592.

At step two of her analysis, the ALJ held that plaintiff's knee impairment was not severe because plaintiff "has not been receiving any specific treatment for his knee until just prior to the hearing" and there was "no evidence that [*sic*] of an affected gait or abilities, as he testified at the hearing." [14-1] 382. According to the ALJ:

> The record reflects that the claimant has a history of an ACL repair of the left knee. With respect to the claimant's ACL repair, there are no actual complaints or treatment for this noted in the record. The diagnosis is historical in nature as the claimant had his knee repaired in 2009. An x-ray of his left knee taken in November 2016 revealed a prior ACL repair and no other acute osseous abnormality (Ex. 7F, 6). At the hearing, the claimant testified that he had a recent visit with Dr. Wu for his knee on March 25, 2018, and he indicated that the claimant has bone on bone and needs a total knee arthroplasty. The record reflects that the claimant was told to get his knee evaluated in April 2017, by Dr. Burke. The claimant made no effort to seek an appointment until early March 2018, and was seen by Dr. Wu, on March 25, 2018. At a visit on March 16, 2018, with a surgeon for his back, she evaluated his knee, noting imaging noted a leg length discrepancy of 1.5 centimeters, and recommended he have surgery on his knee prior to his lumbar spine, as to do the lumbar spine first could complicate post-operative recovery, given the leg length discrepancy. On exam, however, she noted he ambulated with a fairly normal gait, despite the deformity in his left knee, and had normal, 5/5 strength in his bilateral lower extremities, with intact and symmetric sensation (Ex. 14F/3). * * * Overall, the record reflects that the claimant has not been receiving any specific treatment for his knee until just prior to the hearing, and there is no evidence of an affected gait or abilities, as he testified in the hearing. Accordingly, this impairment is considered non-severe, as given the recency of complaints and treatment, there is no evidence the condition will last in excess of 12 months needed to establish severity.

[14-1] 382.

Plaintiff argues that the ALJ's finding that his knee impairment was not severe rests on the mistaken "presum[ption]" that the impairment was limited to "a history of an ACL repair of the knee" even though the record establishes that his ACL repair had failed. [18] 6. Plaintiff also contends that he "did complain of and seek treatment for his knee complaints," such that, by the time of his hearing before the ALJ, plaintiff had "been suffering from pain, weakness, and balance issued caused by his failed ACL repair for nearly a year and a half." [*Id.*]. Plaintiff further asserts that medical records contradict the ALJ's finding that there was no evidence that plaintiff had "an affected gait or abilities." [*Id.*] 6-7. Plaintiff also claims that the ALJ erred by drawing a negative inference about plaintiff's failure to obtain treatment for his knee without adequately exploring his reasons for not having his knee evaluated. [*Id.*] 8. Finally, plaintiff claims that the ALJ could not have addressed or accounted for any limitations stemming from his knee impairment, given her conclusions that the impairment was not severe and there was no evidence of an affected gait or abilities. [*Id.*] 9-10.

The Court rejects these arguments. First, because the ALJ found at step two of her analysis that plaintiff had at least one severe impairment and continued with the remainder of the five-step analysis, no legal error occurred. *See Curvin v. Colvin*, 778 F.3d 645, 649 (7th Cir. 2015). Second, even assuming that the ALJ should have found that plaintiff's knee impairment was a severe impairment, the ALJ's decision adequately explains why any limitations stemming from plaintiff's knee impairment would not have affected plaintiff's RFC.

13

### A. There Was No Legal Error at Step Two.

"Procedurally, the ALJ is required to determine at step two of the sequential analysis whether the claimant in fact has an impairment or combination of impairments that is 'severe.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). "A severe impairment is an impairment or combination of impairments that 'significantly limits [one's] physical or mental ability to do basic work activities.'" *Id.* (quoting 20 C.F.R. § 404.1520(c)) (brackets in original). "As long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process." *Id.* at 926-27 (citing 20 C.F.R. § 404.1523). "[T]he step two determination of severity is merely a threshold requirement." *Id.* (internal quotation marks omitted).

Accordingly, "if an ALJ determines there exists at least one severe impairment, there technically is no legal error at step two." *Leslie T. v. Saul*, Case No. 4:19-cv-113-SEB-DML, 2020 WL 6586658, at *3 (S.D. Ind. Oct. 19, 2019); *see Curvin*, 778 F.3d at 649 (recognizing that ALJ's finding that plaintiff had at least one severe impairment represents "as favorable a determination as can be made" at step two).

In this case, the ALJ found that plaintiff had two severe impairments–degenerative disc disease of the lumbar spine and obesity–and continued with the five-step analysis. [14-1] 382. Therefore, no legal error occurred when the ALJ ruled that plaintiff's knee impairment was not a severe impairment. *Curvin*, 778 F.3d at 649; *Leslie T.*, 2020 WL 6586658, at *3.

To be sure, an ALJ must consider all of a claimant's impairments–including those that the ALJ deems non-severe–along with the objective medical evidence, the claimant's symptoms, and the claimant's credibility when making an RFC determination. *Curvin*, 778 F.3d at 649. The Court recognizes that "an ALJ's failure to address impairments at step two can be a harbinger of errors beyond step two because the ALJ may then fail to address whether the impairments she found were not severe . . . cause limitations in work capacity for purposes of formulating an RFC and then deciding whether the claimant can work." *Leslie T.*, 2020 WL 6586658, at *3. For the reasons discussed below, however the Court finds that the ALJ's RFC finding adequately accounted for the minimal limitations associated with plaintiff's knee impairment.

### B. The ALJ's Decision Adequately Explained Why No Additional Knee-Based Limitations Were Incorporated Into Plaintiff's RFC.

#### 1. The ALJ recognized that plaintiff's ACL repair had failed.

First, nothing in the ALJ's decision is inconsistent with the medical records documenting that plaintiff's ACL repair had failed within a year after the surgery.

Contrary to plaintiff's argument, the ALJ expressly recognized in her decision that plaintiff's ACL repair had failed. When the ALJ discussed the November 2016 consultative examination performed by Dr. Ezike, the ALJ noted that he had diagnosed plaintiff with "a left knee ACL tear status post failed repair[.]" [*Id.*] 385. Furthermore, the ALJ discussed Dr. Burke's May 2017 evaluation of plaintiff, which also noted that the ACL repair had failed. [*Id.*]; *see also* [*id.*] 733 (Dr. Burke's note

15

that plaintiff has "history of an ACL tear, which was repaired and then torn again"). And while it is true that the ALJ elsewhere referred to plaintiff's knee impairment as "the claimant's ACL repair," rather than "the claimant's failed ACL repair," that is how several treatment notes–all postdating the failed repair–characterized plaintiff's knee impairment. *E.g.* [14-1] 621-22 (July 30, 2016 treatment note); [*id.*] 626-27 (June 16, 2016 treatment note); [*id.*] 797-98 (March 15, 2018 treatment note).

There is thus no factual basis for plaintiff's claim that the ALJ failed to recognize that his ACL repair surgery had failed.

> **2. Substantial evidence supported the ALJ's finding that plaintiff's knee impairment did not affect his gait or abilities.**

Second, there was a substantial evidentiary basis for the ALJ's finding that plaintiff's knee impairment did not affect his gait or abilities. [14-1] 382.

As the ALJ noted, Dr. Matteini–who evaluated plaintiff only a few days before the hearing–observed that plaintiff "ambulated with a fairly normal gait, despite the deformity in his left knee, and had normal, 5/5 strength in his bilateral lower extremities, with intact and symmetric sensation[.]" [14-1] 382; *see also* [*id.*] 879 (Dr. Matteini's evaluation). Reviewing the longitudinal record, the ALJ also found that, "on physical exams there are repeated findings of a normal gait without assistive devices, with normal motor strength at 5/5 throughout[.]" [*Id.*] 384. This finding was amply supported by the record. *See* [*id.*] 709 (September 21, 2017 treatment note stating that plaintiff had "normal gait without assistive devices"); [*id.*] 711 (July 18, 2017 treatment note documenting "normal gait without assistive devices"); [*id.*] 856

(June 19, 2017 treatment note documenting "normal gait without assistive devices"); [*id.*] 717 (April 21, 2017 treatment note stating that plaintiff "ambulates without assistive devices"); [*id.*] 780 ("normal gait without assistive devices" at January 16, 2018 consultation); [*id.*] 807 (April 10, 2017 progress note stating that plaintiff "walks with a normal upright gait without assistive devices"); [*id.*] 840 (March 13, 2018 treatment note documenting that plaintiff had "normal gait without assistive devices").

Pointing to the ALJ's statement that there was "no evidence of an affected gait or abilities," plaintiff contends that the ALJ ignored evidence showing that plaintiff had an affected gait. In emphasizing this statement, and ignoring the rest of the ALJ's decision and the substantial medical evidence supporting her finding, plaintiff asks "the Court to read the parts of the ALJ's Decision . . . much too literally and in isolation from the entirety of the Decision." *Tucker v. Comm'r of Soc. Sec.*, Case No. 1:15-cv-1188-JEH, 2016 WL 3264354, at *10 (C.D. Ill. June 14, 2016).

To begin, the ALJ did not ignore contrary evidence; rather, she specifically discussed the November 2016 consultative examination at which plaintiff's "gait was observed as guarded and antalgic." [14-1] 385 (citing [*id.*] 687). Moreover, while the ALJ did not specifically discuss a second instance of plaintiff having a guarded, antalgic gait in April 2017, the ALJ was not required to "discuss every piece of evidence in the record"; she was "prohibited only from ignoring an entire line of evidence that supports a finding of disability." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021). The ALJ acknowledged plaintiff's guarded and antalgic gait, but her

citation to the medical records documenting that plaintiff ordinarily presented to his treaters with a normal gait, along with the other evidence cited by the ALJ, permits the Court to understand the basis of her decision that plaintiff's gait and abilities were not meaningfully affected by the knee impairment. *See Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014) ("the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review").

Importantly, plaintiff cites no opinion evidence in the record to support his claim that his gait or his knee impairment warranted more (or more substantial) limitations on his ability to work than those reflected in the RFC determination. *See* [18] 5-10. Notably, the ALJ gave "little weight" to the opinion of Dr. Bradford Wainer, plaintiff's treating physician, that plaintiff was "only able to sit for two hours and stand/or walk for one hour in an eight-hour workday" and was "rarely able to lift and/or carry up to ten pounds." [14-1] 386. The ALJ explained that a review of Dr. Warner's treatment notes did "not reveal relevant physical exams were completed, particularly involving musculoskeletal or neurologic systems to support such significant limitations (Exh. 13F, 17)." [*Id.*] 387. Plaintiff does not contest this finding.

In sum, the ALJ did not ignore evidence that supported plaintiff's disability claim, and her decision permits the Court to understand her finding that plaintiff's knee impairment did not affect his gait or abilities.

### 3. Plaintiff pursued infrequent treatment for his knee impairment.

Third, the infrequent treatment that plaintiff pursued for his knee impairment provides substantial evidentiary support for the ALJ's finding that plaintiff "has not been receiving any specific treatment for his knee until just prior to the hearing." [14-1] 382.

"[I]nfrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment." *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014). Plaintiff cites only three instances after his 2009 ACL surgery at which he interacted with a medical professional regarding his knee: (1) the November 2016 consultative examination at which plaintiff complained of knee pain, difficulty walking, and falls, *see* [14-1] 685; (2) the April 2017 evaluation with Dr. Burke at which plaintiff complained of weakness in his legs and balance issues, *see* [*id.*] 733; and (3) a March 2018 evaluation by Dr. Matteini, at which plaintiff reported that his left knee was "giving him trouble," that "instability occurs when he is walking," and that "his knee will give way[,]" *see* [*id.*] 879.

There is no dispute that the treatment plaintiff sought for his knee impairment was both recent and infrequent. It was therefore reasonable for the ALJ to conclude that plaintiff "has not been receiving any specific treatment for his knee until just prior to the hearing[.]" [14-1] 382. For one thing, the November 2016 consultative examination occurred only after plaintiff applied for disability benefits. *See* [*id.*] 684 (Dr. Ezike's report titled "Internal Medicine Consultative Examination *For the*

19

*Bureau of Disability Determination Services*") (emphasis supplied). For another, plaintiff concedes that he was "evaluated primarily for his back condition" at the April 2017 appointment with Dr. Burke. [18] 6. Finally, Dr. Matteini's evaluation in March 2018 occurred only a few days before plaintiff's hearing before the ALJ. *Compare* [*id.*] 878-80 (Dr. Matteini's report of March 14, 2018 evaluation) *with* [*id.*] (transcript of March 23, 2018 hearing). That plaintiff could point to only three instances of treatment for his knee–one of which occurred during the disability proceedings, another of which was focused on plaintiff's back, and the last of which occurred immediately before the hearing–gave the ALJ a reasonable basis to find that plaintiff's knee impairments were neither severe nor the source of meaningful limitations on his ability to work.

To be sure, the ALJ stated that "there are no actual complaints or treatment" for the knee impairment "noted in the record." [14-1] 382. Read in isolation and without regard to anything else the ALJ wrote or cited in connection with plaintiff's knee impairment, this statement would be inaccurate. But the Court "applies a common-sense reading to the entirety of an ALJ's decision." *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019). The Court therefore understands this statement, which immediately preceded the ALJ's discussion of the scant treatment record associated with the knee impairment, as reflecting the ALJ's judgment that plaintiff had not pursued a meaningful degree of treatment, a conclusion that has substantial evidentiary support in the record.

20

4. **The ALJ adequately explored plaintiff's reasons for not pursuing a knee evaluation or surgery.**

Fourth, the Court disagrees that the ALJ drew an adverse inference from this scant treatment record without adequately inquiring into plaintiff's reasons for declining a knee evaluation or surgery.

"Infrequent treatment or a failure to follow a treatment plan 'can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment.'" *Elaine B. v. Kijakazi*, No. 20 CV 4184, 2021 WL 3511314, at *5 (N.D. Ill. Aug. 10, 2021) (quoting *Beardsley*, 758 F.3d at 840). "But an ALJ cannot draw inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Id.* (internal quotation marks omitted).

The hearing transcript refutes plaintiff's contention that the ALJ failed to explore his reasons for not pursuing either the recommended evaluation of his knee or knee surgery. The ALJ asked plaintiff why, after Dr. Burke had recommended in April 2017 that he have his knee evaluated, he did not have an evaluation until nearly a year later–and immediately before the hearing. [14-1] 407. Plaintiff responded that he "was scared" because "a lot of people I know that had surgeries they're going through many surgeries and they're taking more pills and I don't know." [*Id.*]. When the ALJ then asked why plaintiff had waited "until about a year later" to see Dr. Wu, plaintiff responded, "I knew what she was going to say, get a knee replacement. And stupid me looked [at] a video and it just scared me." [*Id.*].

21

The ALJ was thus fully aware of plaintiff's reasons for delaying his knee evaluation for nearly a year and declining to have knee surgery. Plaintiff does not cite any authority, moreover, establishing that the ALJ was bound to accept plaintiff's fear of surgery as a good–let alone dispositive–reason for not pursuing either the evaluation or surgery. Nor, finally, does plaintiff cite any medical evidence in the record that would support his fear of surgery or substantiate his belief that he would be "taking more pills" as a result of the surgery. *Compare Latham v. Comm'r of Soc. Sec.*, Case No. 16-cv-10690, 2017 WL 1173773, at *3 (E.D. Mich. Mar. 30, 2017) (sustaining ALJ's denial of benefits where plaintiff "directs the Court to no record evidence that would support a claim that Plaintiff had 'justifiable reasons' for refusing to follow recommended treatment or to act upon recommended referrals"), *with Aguirre v. Astrue*, No. ED CV 08-1176-PLA, 2009 WL 3346741, at *5 (C.D. Cal. Oct. 14, 2009) (remanding based on ALJ's improper evaluation of plaintiff's subjective testimony where, *inter alia*, "there was in fact medical evidence justifying plaintiff's fear that surgery could make her condition worse").

Accordingly, it was reasonable for the ALJ to conclude that plaintiff's failure to follow through on the recommended evaluation and surgery undermined his contention that his knee impairment meaningfully limited his ability to work. *See Latham*, 2017 WL 1173773, at *3 ("A claimant's failure to comply with prescribed or recommended treatment is a factor tending to discount the credibility of his allegations of disability.").

### 5. The ALJ did not abuse her discretion by not requesting an updated medical opinion.

Finally, the Court rejects plaintiff's argument that the ALJ erred by failing to request an updated medical opinion in light of "the 2017 and 2018 findings of varus instability or the 2018 x-ray revealing joint space narrowing in [his] left knee." [18] 8.

As plaintiff observes, *see* [18] 7, the non-examining state agency consultants who reviewed his file did so in 2016 and thus did not have access to the medical records generated in 2017 and 2018. *See* [14-1] 428-35; [*id.*] 437-46. These records included Dr. Burke's observation at the April 2017 evaluation that plaintiff's left knee was "in varus" on physical examination, [14-1] 734, and Dr. Matteini's observation, based on an x-ray taken at the March 2018 evaluation, that "there is even more medial joint space narrowing and varus deformity of the knee," [*id.*] 879.

But "[i]t is common for there to be a lag between the state agency physicians' reviews and the ALJ's decision, so the fact that new medical records came in after the state agency physicians conducted their reviews, is not, by itself, problematic." *Shelia M. v. Saul*, No. 20 C 664, 2021 WL 1784775, at *6 (N.D. Ill. May 5, 2021). Of course, "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *see also Charles B. v. Saul*, No. 2:19-cv-84-JPH-DLP, 2020 WL 1163924, at *14 (S.D. Ind. Mar. 11, 2020) ("The Seventh Circuit has repeatedly held that an ALJ may not 'play doctor' and interpret 'new and potentially decisive medical evidence' without medical

scrutiny."). Under "[t]he applicable regulations and Seventh Circuit case law," however, it is left "to the discretion of the ALJ to consult a medical expert when the evidence received is inadequate for the ALJ to determine whether the claimant is disabled." *Johnson v. Comm'r of Soc. Sec.*, Cause No. 1:15-cv-310-SLC, 2017 WL 461560, at *9 (N.D. Ind. Feb. 2, 2017).

In this case, failing to consult a medical expert to interpret the varus findings from 2017 and 2018 and the 2018 x-ray was not an abuse of discretion.

First, the ALJ's RFC determination suggests that the ALJ accounted for the medical records that were generated after the state agency consultants' examinations. Although the ALJ gave great weight to the state agency medical consultant's opinion at the initial level, which was "consistent with the record at the time of the assessment," the ALJ also recognized that "more recent medical evidence received at the hearing level reflect[ed] that the claimant is somewhat more restricted" than he had been at the time of the initial consultation. To account for that "more recent medical evidence," the ALJ incorporated additional restrictions into her RFC determination beyond those imposed by the initial consultant. *See* [14-1] 386 (ALJ's finding that plaintiff could "only perform postural activities on occasion" but could not climb ladders, ropes, or scaffolds "due to the combination of his impairments"). Likewise, the ALJ gave great weight to the state agency consultant's opinion at the reconsideration level because it was "consistent with evidence of record as a whole, including more recent evidence submitted at the hearing level" and

properly accounted for plaintiff's ability to perform postural activities only occasionally and his inability to climb. [*Id.*].

Second, the ALJ's decision reflects that she was aware of the substance of the medical evidence generated in 2017 and 2018. Most importantly, the ALJ knew that at least two of plaintiff's treaters had recommended that plaintiff needed a knee replacement. *See* [14-1] 382 (recounting Dr. Wu's recommendation on March 25, 2018 that plaintiff has "bone on bone and needs a total knee arthroplasty"); *id.* (recounting Dr. Matteini's recommendation that plaintiff "have surgery on his knee prior to his lumbar spine"). Citing directly to Dr. Burke's evaluation documenting the 2017 varus finding, moreover, the ALJ recognized that Dr. Matteini had found that plaintiff "ambulated with a fairly normal gait, despite the deformity in his left knee." [*Id.*] 382 (citing [*id.*] 879).

Third, plaintiff has not established that the medical evidence at issue "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician[.]" *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). For one thing, neither Dr. Burke nor Dr. Matteini discussed the significance of a varus finding generally or with regard to plaintiff's specific knee impairment. For another, neither Dr. Burke nor Dr. Matteini identified any specific limitations in plaintiff's abilities based on the varus findings or the 2018 x-ray. Finally, as just discussed, the ALJ's RFC determination suggests that the ALJ properly accounted for the more recent medical evidence that was introduced at the hearing level but was not available to the state agency consultants.

In these circumstances, where plaintiff cannot show that his treaters themselves opined that the more recent medical evidence affected his work-related limitations, the Court finds that plaintiff has not shown that it was an abuse of the ALJ's discretion to evaluate plaintiff's knee impairment without requesting an updated medical opinion. *See Keys v. Berryhill*, 679 F. App'x 477, 481 (7th Cir. 2017) ("It is true that Drs. Brill and Sands did not review these later reports, but Keys has not provided any evidence that the reports would have changed the doctors' opinions . . . Keys did not explain how the findings on those reports undermine the uncontroverted opinions of Drs. Brill and Sands, who found limitations in Keys' ability to lift, carry, and perform postural movements, but limitations that did not render him completely disabled."); *see also Poyck v. Astrue*, 414 F. App'x 859, 861 (7th Cir. 2011) ("Particularly in counseled cases, the burden is on the claimant to introduce some objective evidence that further development of the record is required.").

*     *     *

For these reasons, the Court holds that the ALJ did not commit legal error at step two of her analysis, and that substantial evidence supports her RFC determination.

## II. The ALJ's Subjective Symptom Analysis Was Not Patently Wrong.

"An ALJ's findings concerning the intensity, persistence, and limiting effect of claimant's symptoms must be explained sufficiently and supported by substantial

evidence." *Candice A.Z. v. Kijakazi*, No. 19 C 8174, 2021 WL 3187783, at *9 (N.D. Ill. July 28, 2021).

"To determine the credibility of allegations of disabling pain, an ALJ may consider several factors, including objective medical evidence and any inconsistencies between the allegations and the record." *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2021). "A claimant's assertions of pain, taken alone, are not conclusive of a disability." *Id.* "When assessing an ALJ's credibility determination, [the Court] do[es] not . . . undertake a de novo review of the medical evidence that was presented to the ALJ." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The Court will not reverse an ALJ's subjective symptom conclusions unless they are "patently wrong, meaning they lack any explanation or support." *Candice A.Z.*, 2021 WL 3187783, at *9; *see also Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) ("We give the ALJ's credibility finding special deference and will overturn it only if it is patently wrong.") (internal quotation marks omitted).

In crafting plaintiff's RFC, the ALJ found that:

the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the severity as alleged is not consistent with the record of evidence. While the imaging shows degenerative changes [in plaintiff's back], there is no evidence of nerve root impingement or cord compression. The claimant's pain has been effectively managed with medication and periodic injections (Ex. 3F, 13). The claimant has not completed physical

therapy. Although surgery has been recommended as an option since his alleged onset date, the claimant has declined to proceed due to various reasons. While the claimant reported that he was reluctant to have surgery due to fear, at one point, he reported to medical professionals that he was a full time caregiver for his mother and did not want to get the surgery at that time (Ex. 9F, 10). Despite his assertions of such severe limitations, on physical exams there are repeated findings of normal gait without assistive devices, with normal motor strength at 5/5 throughout, and cranial nerves and sensation grossly intact (Ex. 1F, 9; 3F, 13, 15, 19; 9F, 10, 12, 18).

Although the claimant reports that he no longer does chores around the house, no longer drives due to the side effects of his medication, is unable to wash the lower part of his body, and that his leg gives out at times, there is no evidence that he has reported this to his health care providers (Ex. 3F, 13; 9F, 12, 18). Finally, it should be noted that the claimant reported that he stopped working because he was laid off from his job where he was a manager, when a new owner wanted him to return to work that required additional duties that he was unable to perform. Interestingly, after he lost his job, he also applied for and received unemployment from his employer, where he had to certify that he was ready, able, and willing to perform work (Ex. 9D). Accordingly, the claimant's assertions are not fully supported by the record as a whole.

[14-1] 384-85.

## A.    Evidence of Nerve-Root Impingement or Cord Compression

Plaintiff first argues that the ALJ's conclusion that there was no evidence of nerve-root impingement or cord compression is contradicted by (1) an MRI of his lumbar spine showing the presence of central canal stenosis, (2) his prior diagnoses of lumbar radiculopathy, and (3) his complained-of or demonstrated symptoms that are characteristic of nerve-root compression, such as pain radiating down his legs, decreased range of motion in his lumbar spine, positive straight-leg raising tests, muscle weakness, and sensory loss. [18] 11.

The Court rejects this argument and finds that the ALJ accurately described the lack of evidence of nerve-root impingement and cord compression in the medical record.

It is undisputed that an MRI of plaintiff's lumbar spine taken in March 2017 showed that plaintiff's spondylosis "is causing bilateral foraminal as well as central canal stenosis." [14-1] 734. It is also undisputed that plaintiff has been diagnosed with lumbar radiculopathy. [*Id.*] 629, 655, 718. But plaintiff has not cited any medical records or medical opinion testimony to establish that either of these conditions (or some other condition) caused, produced, or resulted in nerve-root impingement or cord compression. *See* [18] 11-12. Instead of relying on materials in the administrative record to rebut the ALJ's factual finding, plaintiff points the Court to two websites that define central stenosis and lumbar radiculopathy. Plaintiff cites to https://mayfieldclinic.com for the proposition that "[c]entral stenosis occurs when the central spinal canal is constricted . . . *causing compression of the spinal cord.*" [18] 11 (emphasis supplied). Plaintiff then cites to https://www.ncbi.nlm.nih.gov for the proposition that lumbar radiculopathy entails "symptoms occurring secondary to mechanical and/or inflammatory cycles compromising at least one of the lumbosacral nerve roots." [*Id.*]. Based on these Internet definitions and explanations of central stenosis and lumbar radiculopathy, plaintiff's position appears to be that the presence or diagnosis of these conditions constitutes, *ipso facto*, evidence of nerve-root impingement or cord compression.

The Court cannot accept this analysis.

"[T]he burden of proving [that the claimant] is disabled always rests with Plaintiff," *Charmaine R. v. Saul*, No. 18 C 7955, 2021 WL 83737, at *5 (N.D. Ill. Jan. 11, 2021), and "[i]t is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability," *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). Because plaintiff has not identified any objective medical evidence or opinion testimony that establishes the existence of nerve-root impingement or cord compression, the Court cannot fill this hole in the record by using websites chosen by plaintiff to determine that the MRI finding of central canal stenosis and the diagnosis of lumbar radiculopathy establish, *ipso facto*, nerve-root impingement or spinal cord compression.

On this point, the Court finds the decision in *Dilworth v. Saul*, Case No. 19-cv-12134, 2021 WL 869654 (E.D. Mich. Mar. 9, 2021), to be persuasive. There the plaintiff argued that the ALJ erred in holding that his impairments did not meet or equal Listing 1.04 because plaintiff failed to establish the "threshold requirement" of nerve-root compromise. *Id.*, at *3. According to plaintiff, the fact that he had been diagnosed with lumbar radiculopathy was sufficient to prove the existence of nerve-root compromise. *Id.* To support that contention, plaintiff cited, not to the record, but to a website stating that "lumbar radiculopathy is *typically* caused by nerve root compromise." *Id.* (emphasis in original). The district court rejected plaintiff's argument because plaintiff "fail[ed] to indicate anything in the record that shows his lumbar radiculopathy was indeed caused by nerve root compression." *Id.*; *see also Moreno v. Berryhill*, 882 F.3d 722, 724 (7th Cir. 2018) (stating that lumbar

radiculopathy refers to "lower back pain caused by compression, inflammation *and/or* injury to a spinal nerve root") (emphasis supplied); *Buchholtz v. Barnhart*, 98 F. App'x 540, 541-42 (7th Cir. 2004) (describing "spinal stenosis" as "a narrowing of the spinal canal that *can* compress and irritate nerve roots branching out from the spinal cord") (emphasis supplied).

More generally, the case law establishes that claimants regularly substantiate their claims of nerve-root impingement or cord compression with additional evidence beyond a bare diagnosis of lumbar radiculopathy or the presence of stenosis on an MRI. For example, in *James v. Saul*, Civil No. 4:20cv34, 2021 WL 1526597, at *8 (N.D. Ind. Apr. 19, 2021), the district court remanded the case based on the ALJ's failure to consider "critical evidence" when analyzing whether plaintiff met Listing 1.04, including "*objective testing showing significant spinal cord compression.*" (Emphasis supplied). Likewise, in *Hatter v. Colvin*, No. 3:12-CV-851 JVB-CAN, 2013 WL 5531388, at *2 (N.D. Ind. Oct. 7, 2013), the medical record included a note by the plaintiff's neurosurgeon to the effect that an MRI revealed the presence of a disc protrusion that caused two forms of stenosis "with likely nerve root compression." As noted above, and as correctly stated by the ALJ, plaintiff has not introduced any such evidence here.

Finally, even if the Commissioner recognizes some of plaintiff's symptoms as characteristic of nerve-root compression for purposes of Listing 1.04(A), *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A), plaintiff still points to no evidence that a compressed nerve root caused those symptoms. And while plaintiff invokes Listing

1.04 to support his claim that the ALJ erred in finding that there was no evidence of nerve-root impingement or cord compression, plaintiff does not contest the ALJ's ruling that his impairments did not meet or equal Listing 1.04.

For these reasons, plaintiff has not shown that the ALJ erred by concluding that there was no evidence of nerve-root impingement or cord compression.

### B.    Pain Management

Plaintiff next argues that the ALJ's finding that plaintiff effectively managed his pain through medication and lumbar injections was erroneous. In support, plaintiff contends that the ALJ "failed to note" that the "efficacy" of the lumbar injections "was fading as early as 2017" and "had essentially disappeared by early 2018." [18] 12. Plaintiff also maintains that the ALJ "failed to consider the context of [his] pain management," specifically that the injections "only decreased his pain by fractions and helped him maintain" only an "extremely limited" functionality. [*Id.*].

The Court rejects these contentions and concludes that the ALJ had a substantial evidentiary basis for finding that plaintiff's pain "has been effectively managed with medication and periodic injections." [14-1] 384.

The ALJ traced the course of plaintiff's lumbar injections and his use of pain medications in considerable detail. *See* [14-1] 385-86. Throughout the course of the injection therapy, plaintiff repeatedly acknowledged that the injections provided considerable benefit in terms of pain relief and improved functionality. *E.g.* [*id.*] 646, 651, 653, 747, 753, 759, 761, 778.

That is not to say, however, that the injections were a panacea–and nothing in the ALJ's decision suggests that the ALJ believed that they were. Indeed–and directly contrary to plaintiff's argument–the ALJ recognized that "by February 2017," plaintiff reported "only minimal relief from his lumbar injections." [*Id.*] 385. While the ALJ accurately noted the limitations of plaintiff's injection therapy, nothing in the record supports plaintiff's claim that the efficacy of the injections had "essentially disappeared" by early 2018. To the contrary, as late as December 2017 plaintiff "endorse[d] about 50% durable pain relief" from an injection he had received a month earlier. [14-1] 783. Similarly, in January 2018, plaintiff acknowledged that the injections had "helped his pain and function," while in March 2018 plaintiff reported that his most recent injection, in February, had resulted in "25% durable relief." [*Id.*] 840.

Dr. Burke's April 2017 evaluation corroborates the ALJ's findings and supports the ALJ's decision that the injections were effective at managing plaintiff's pain. Reviewing the treatment record, Dr. Burke recognized that plaintiff "has been treating his symptoms conservatively since with narcotic pain medications, muscle relaxers, Voltaren gel, and epidural steroid injections." [14-1] 733. Dr. Burke also noted that plaintiff had received his most recent injection in December 2016, and that this injection had "provided him with moderate relief till April." [*Id.*]. Indeed, Dr. Burke even recommended that plaintiff continue with the injections pending plaintiff's decision whether to undergo knee surgery:

> I also recommended that the patient continue with conservative care
> with injections since he is still getting multiple months of relief with

this. This will help him get things in order for him to undergo surgery for weight loss and to have appropriate discussions about whether he or not he wants to proceed with a knee surgery.

[*Id*.].

Nor is there any basis in the medical record for plaintiff's contention that his functionality was "extremely limited" during the course of his lumbar-injection therapy. Plaintiff occasionally told his treaters that his pain affected his ability to work or perform activities of daily living, *see* [*id*.] 651, 757, 761, 767, but there is no indication in the treatment notes that plaintiff claimed to be "extremely limited" in his functioning. It was therefore reasonable for the ALJ to contrast plaintiff's hearing testimony–where he described very specific and very severe limitations in his activities of daily living–with his past statements to his treaters, which lacked those kinds of detailed claims of severe limitations. *See* [*id*.] 384; *see also Michalec v. Colvin*, 629 F. App'x 771, 775 (7th Cir. 2015) ("In light of the inconsistencies between Michalec's statements to his doctors and his testimony at the hearing, Michalec has not shown that the ALJ's credibility assessment is patently erroneous."); *Bennett v. Berryhill*, Cause No. 3:16-CV-874-PPS-MGG, 2018 WL 798190, at *5 (N.D. Ind. Feb. 9, 2018) (ALJ's credibility determination, based in part on "several inconsistencies in Bennett's testimony," including Bennett's failure to report "such severe pain to treatment providers since the alleged onset of his disability," was not patently wrong).

Finally, plaintiff's argument entirely ignores his use of pain medication, which he consistently reported to be beneficial without adverse effects. [*Id*.] 753, 756, 759, 761, 767, 840.

For these reasons, there is a substantial evidentiary basis for the ALJ's conclusion that the lumbar injections and plaintiff's pain medications were "effective[ ]" tools–though not perfect ones–for managing plaintiff's back pain. The ALJ appropriately recognized that the injections often provided considerable relief for plaintiff's pain, just as she accurately observed that the injections sometimes provided minimal, temporary, or insufficient relief. At its core, plaintiff's argument is a request that the Court conduct a de novo review of the medical record, reweigh the evidence, and find that the injections and pain medications were ineffective, but that kind of analysis is beyond the scope of the Court's review. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) ("The court is not to reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner.") (internal quotation marks omitted).

### C.    Failure to Pursue Surgery and Physical Therapy

Plaintiff next argues that the ALJ should not have based her credibility determination on his avoidance of lumbar surgery and his failure to pursue physical therapy. [18] 13-14. According to plaintiff, he was "not a surgical candidate at any point during the relevant period because of his weight and his smoking habit," and thus his "reluctance to undergo a surgery for which he was not actually a candidate should not impugn his allegations related to the impairment that his doctors believe would benefit from the surgery when he is a candidate." [*Id.*]. Regarding the failure to enroll in physical therapy, plaintiff contends that the ALJ did not inquire into his reasons for not doing so. [*Id.*] 14.

The Court disagrees that these aspects of the ALJ's decision establish that her subjective symptom analysis was patently wrong.

The ALJ accurately noted that plaintiff had long voiced his opposition and reluctance to undergo spinal surgery. At the same time, both Dr. Burke and Dr. Matteini, the two orthopedic surgeons who evaluated plaintiff for a potential back surgery, opined that plaintiff was not a candidate for surgery in April 2017 or March 2018 due to his obesity and smoking habit. As plaintiff observes, he eventually quit smoking [14-1] 879–a step that is consistent with a desire to become a candidate for, and ultimately undergo, surgery, and the medical records show that plaintiff was trying to lose weight. Nevertheless, the Court finds that the ALJ could reasonably have given weight to plaintiff's long-standing opposition to lumbar surgery: had his back pain been as debilitating as plaintiff maintains, one could reasonably question why he was so opposed to surgery and for so long–notwithstanding that at least two doctors had recommended the procedure. In the Court's view, this is another instance where plaintiff would like the Court to reweigh the evidence and draw a different conclusion about the significance of plaintiff's opposition to lumbar surgery. *See Burmester*, 920 F.3d at 510

The Court agrees with plaintiff, however, that the ALJ erred by drawing a negative inference about the credibility of his symptoms without exploring why plaintiff did not pursue physical therapy. Because the ALJ did not question plaintiff about his failure to pursue physical therapy, it was improper for the ALJ to draw a negative inference based on that failure. *See Elaine B.*, 2021 WL 3511314, at *5.

Nevertheless, the Court concludes that this error does not warrant remand. "The Seventh Circuit has held that, in discounting a claimant's subjective allegations, '[n]ot all of the ALJ's reasons must be valid as long as *enough* of them are." *Berndt v. Saul*, Case No. 20-CV-838-SCD, 2021 WL 2856594, at *9 (E.D. Wis. July 8, 2021) (quoting *Halsell v. Astrue*, 357 F. App'x 717, 722-23 (7th Cir. 2009) (emphasis in original). Because there was a substantial basis for the ALJ's findings that plaintiff introduced no evidence of nerve-root impingement or cord compression and that plaintiff's pain was effectively managed through lumbar injection therapy and pain medications, the Court finds that the ALJ's subjective symptom analysis was not patently wrong.

### D. Unemployment Benefits

Finally, plaintiff argues that the ALJ erred by basing her credibility determination in part on the fact that plaintiff obtained unemployment benefits during the period for which plaintiff claimed disability benefits. [18] 14-15.[4]

Seventh Circuit case law "clearly permits the ALJ to give some consideration to" the claimant's pursuit of unemployment benefits during the period of time for which he claims disability payments "when assessing credibility." *Scrogham*, 765 F.3d at 699. "But attributing a lack of credibility to such action is a step that must be

---

[4] Plaintiff also contends that the ALJ based her credibility determination on the fact that plaintiff was laid off from his job because a manager wanted him to perform additional duties that were beyond his capacity. [18] 14. Like the Commissioner, however, *see* [26] 14 n.5, the Court does not read the ALJ's decision this way. Rather, the ALJ appears to have noted this fact only as a preface to her point that, shortly after he was laid off work because he was unable to perform new, additional duties, plaintiff certified he was, in fact, able and ready to work in order to receive unemployment benefits. *See* [14-1] 385.

taken with significant care and circumspection," and "[a]ll of the surrounding facts must be carefully considered." *Id.* "This consideration is important because, as the Seventh Circuit has recognized, desperate people can do desperate things; that is they could lie about being able to work." *Minett v. Colvin*, No. 13 CV 4717, 2015 WL 7776560, at *7 (N.D. Ill. Dec. 2, 2015).

The record reflects that plaintiff collected unemployment benefits between August 8, 2016 through April 4, 2017. *See* [14-1] 525. This was after plaintiff's alleged onset date of June 29, 2016, *see* [*id.*] 379, and thus during the period for which he sought benefits. As the Seventh Circuit has explained, "unemployment benefits may be relevant if a claimant has represented to the State that he is able to work during the period for which he has applied for federal disability benefits[.]" *Lambert v. Berryhill*, 896 F.3d 768, 778 (7th Cir. 2018). Accordingly, the ALJ reasonably looked to plaintiff's receipt of unemployment benefits as one factor to assess his credibility. *Accord Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) ("we are not convinced that a Social Security claimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work should play absolutely *no* role in assessing his subjective complaints of disability") (emphasis in original).

At the same time, it does not appear that the ALJ exercised the requisite "significant care and circumspection," *Scrogham*, 765 F.3d at 699, in making this finding. The ALJ's analysis of this issue in her opinion is superficial, and the ALJ did not question plaintiff about his unemployment benefits at the hearing. The Court

therefore concludes that the unemployment benefits receipt does not constitute substantial evidence for the credibility assessment. However, because the ALJ reasonably relied on the lack of evidence to prove nerve-root impingement or cord compromise, as well as the evidence establishing that plaintiff effectively managed his pain with lumbar injections and medication, the Court concludes that the ALJ's subjective symptom assessment was not patently wrong.

*   *   *

The ALJ accurately observed that there was no evidence of nerve-root impingement or cord compression, and the medical records amply supported her decision that plaintiff effectively managed his back pain with lumbar injections and pain medication. Likewise, the ALJ reasonably concluded that plaintiff's hearing testimony about the severity of his limitations was inconsistent with his statements to his treaters, and the record permitted her to find that plaintiff's longstanding opposition to undergoing lumbar surgery undermined the credibility of his subjective symptom allegations. Thus, while "the ALJ's reasoning is imperfect" when it comes to her evaluation of plaintiff's failure to pursue physical therapy and his receipt of unemployment benefits, there remains "substantial evidence supporting her decision to discount [plaintiff's] credibility." *Halsell*, 357 F. App'x at 723; *see Berndt*, 2021 WL 2856594, at *9 ("[n]ot all of the ALJ's reasons must be valid as long as enough of them are") (internal emphasis and quotation marks omitted).

## Conclusion

For the foregoing reasons, plaintiff's motion for summary judgment [17] is denied, the Commissioner's motion for summary judgment [25] is granted, and the Commissioner's decision denying plaintiff's application for benefits is affirmed.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: September 20, 2021**